```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JON FONTAINE,

                    Plaintiff

       -v-                                     9:15-CV-432

MICHAEL CORNWALL; MARCOS NIEVES;
and MARY FRANCE,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| LAW OFFICE OF JESSICA M. GORMAN<br>Attorneys for Plaintiff<br>P.O. Box 706<br>Albany, NY 12201 | JESSICA M. GORMAN, ESQ. |
| HON. LETITIA JAMES<br>Attorney General for the State of New York<br>Attorneys for Defendants<br>The Capitol<br>Albany, NY 12224 | ADRIENNE J. KERWIN, ESQ.<br>Ass't Attorney General |

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

### I.    **INTRODUCTION**

     This complaint arises from plaintiff Jon Fontaine ("Fontaine" or "plaintiff")'s medical and psychiatric treatment at Groveland Correctional Facility ("Groveland"), where he was incarcerated in 2013. Plaintiff alleges that Marcos Nieves, M.D. ("Dr. Nieves"), who worked for the New York Office of Mental Health ("OMH") and treated plaintiff at Groveland, failed to

adequately treat plaintiff's depression, which led to his attempted suicide on April 12, 2013. Mary France ("France"), a Licensed Master of Social Work, also worked for OMH and treated plaintiff at Groveland, and, plaintiff alleges, failed to properly care for his mental health. Nurse Practitioner Michael Cornwall ("N.P. Cornwall") is a DOCCS employee at Groveland, and prescribed plaintiff several medications, including Baclofen, a muscle relaxer that N.P. Cornwall allowed plaintiff to carry unsupervised.

On April 12, 2013, Fontaine alleges that he took six weeks' worth of Baclofen in an attempt to take his own life. On April 11, 2015, he filed a complaint against Dr. Nieves, France, and N.P. Cornwall, alleging that Dr. Nieves and France failed to adequately treat his depression and suicidal thoughts and ideations, and that N.P. Cornwall improperly allowed him to self-carry medication.[1] Plaintiff brings three claims: (1) deliberate indifference to his need for adequate medical care under 42 U.S.C. § 1983 ("§ 1983"); (2) negligence under New York Common Law; and (3) negligent infliction of emotional distress under New York Common Law. On July 28, 2017, defendants filed the present motion for summary judgment under Federal Rule of Civil Procedure ("Rule") 56.

## II. BACKGROUND

In the autumn of 2012, Fontaine pled guilty to attempted burglary in the Second Degree in Monroe County, New York. Dkt. 46-1 ("Fontaine Dep."), p. 14.[2] Plaintiff received a sentence of five years' imprisonment. *Id.* at 15. He began serving his sentence in Wayne County Jail where he was prescribed the drug Remeron for anxiety and depression. *Id.* at 42-44.

---

[1] The complaint also alleges that Subbarao Ramineni, M.D., failed to care for Fontaine's illnesses and injuries after his suicide attempt. Dkt. 26, ¶ 45. Plaintiff voluntarily dismissed his complaints against Dr. Ramineni with prejudice on June 23, 2017. Dkt. 44.
[2] Page numbers correspond to CM/ECF.

On December 4, 2012, Fontaine was placed on 2:1 watch in the residential crisis treatment program at Fishkill Correctional Facility ("Fishkill") because he expressed a desire to take his own life. Dkt. 46-5, p. 130. On December 7, 2012, Fishkill medical staff noted plaintiffs' diagnoses of dysthymia,[3] posttraumatic stress disorder, and antisocial personality disorder. Dkt. 45-10 ("France Dep."), pp. 19-20.

On December 31, 2012, Fontaine left Fishkill and arrived at Groveland. Fontaine Dep. 49. After his arrival at Groveland, plaintiff "started getting more depressed." *Id.* at 50. Fishkill provided Groveland with plaintiff's treatment notes, which were available to defendants Dr. Nieves and France. France Dep. 20-21; Dkt. 45-15 ("Nieves Dep."), p. 35. The notes provided that OMH had designated plaintiff as a Level Two mental health risk.[4] Dkt. 46-4 p. 158. The notes additionally informed OMH staff that plaintiff had been on suicide watch at Fishkill in December of 2012. Dkt. 46-5, p. 130.

### A. **Defendant Dr. Nieves**

On January 22, 2013, defendant Dr. Nieves, whose office was located at the Capital District Psychiatric Center in Albany, first treated Fontaine via video conference. Nieves Dep. 14, 16; Dkt. 46-5, pp. 80-82. Doctor Nieves knew from the outset that plaintiff had attempted suicide in 2002. Dkt. 45-13, ¶ 6.

During his interview, Dr. Nieves noted that Fontaine had a "depressed mood, blunted affect, and coherent speech; no psychosis, suicidal or homicidal ideas, intent, or plan."[5] Nieves Dep. 30-31; Dkt. 46-5, p. 80. Plaintiff had been on the maximum permitted dose of

---

[3] Dysthymia involves depression or depressive symptoms recurring on an on-and-off basis for a minimum of two years. France Dep. 65; Nieves Dep. 23. It is generally considered a less severe diagnosis than major depression. Nieves Dep. 24-25.
[4] OMH labels inmates based on the severity of their mental health needs on a scale of one to six, with one being the highest need for mental help and six requiring no mental help. France Dep. 32.
[5] Doctor Nieves defines suicidal ideas, intent, or plans as demonstrating an intent to carry out suicidal impulses, as opposed to death wishes, which are merely thoughts of death. Nieves Dep. 31.

3

Remeron of forty-five milligrams per day, and although this had initially helped with his depression, his symptoms had subsequently returned. Nieves Dep. 16-17.

Fontaine told Dr. Nieves that he experienced "daily death wishes." Fontaine Dep. 53. Doctor Nieves believed that plaintiff's behavior in the interview was sincere. Nieves Dep. 34. Given the sum total of plaintiff's mental health history and his presentation during the interview, he nevertheless determined that plaintiff presented no risk of suicide, because of his lack of suicidal intentions or plan. *Id.* at 32; Dkt. 46-5, p. 80. Nevertheless, the doctor added Celexa, an additional antidepressant, to plaintiff's existing prescription of Remeron. Nieves Dep. 18; Dkt. 46-5, p. 81.

Dr. Nieves recommended a follow-up appointment with Fontaine for six to eight weeks later. Dkt. 46-5, p. 81. He wanted to make sure that there was at least a six-week period for plaintiff's new medications to begin taking effect. Nieves Dep. 19-20. The doctor in fact did not schedule to see plaintiff again until April 22, 2013. Nieves Dep. 37-38; Dkt. 46-5, pp. 82-83.

**B. Defendant France**

During Fontaine's four months at Groveland, defendant France believes that she met with him twice. France Dep. 24. On February 14, 2013, she first examined plaintiff. Dkt. 46-5, p. 161. She believes that she knew of plaintiff's psychological diagnoses before meeting with him from the notes taken by Fishkill staff. France Dep. 17-18. Plaintiff's suicidal feelings contained in the Fishkill notes caused her some concern, because part of her job is to assess the lethality of a patient: the danger they pose to themselves or others. *Id.* at 23-24. As part of this inquiry, she took down plaintiff's mental health history. *Id.* at 27-28. Plaintiff told her that he had overdosed on sleep medications in 2002. Dkt. 46-5, p. 161.

4

Plaintiff also recounted that he had tied a sheet around his neck but had not fully attempted to hang himself. France Dep. 28; Dkt. 46-5, p. 161.

Despite the Fishkill notes, France had no "particular concerns" of Fontaine's lethality. France Dep. 24. In their first conversation, Fontaine presented to her as "narcissistic," through his use of language, poor decision-making, and impulse control. France Dep. 40. Nevertheless, she wrote in her notes that he presented zero indication of suicidality, because he made no statements indicating suicidal thoughts or intent despite her specific questions geared at suicide. Dkt. 46-5 p. 162.

France saw Fontaine again on March 14, 2013. Dkt. 46-5, p. 163. She observed plaintiff to be "well engaged, cooperative . . . calm, irritable at times, playful at others." *Id.* at 39-40; Dkt. 46-5, p. 163. She noted that plaintiff did not present as depressed. France Dep. 39-40. Plaintiff told her, however, that he had "daily thoughts of suicide." Fontaine Dep. 50-51. She responded that plaintiff "couldn't let [him]self think that way." *Id.* at 51. Plaintiff also told her that "sometimes [he] think[s] [he]'d be better off dead . . . ." Dkt. 46-5, p. 163. However, in her notes, she wrote that plaintiff then smiled and quickly told her that he wouldn't actually kill himself. *Id.*

According to France's notes, Fontaine admitted these comments were "attention-seeking." France Dep. 49; Dkt. 46-5, p. 164. She stated at her deposition, however, that patients sometimes attempt suicide simply for attention. France Dep. 50-51. Nevertheless, at the end of the session, she had no concerns that plaintiff was at a particular risk of suicide. France Dep. 51. She attributes that determination both to his stating that he had no plans to commit suicide and that he presented as "smug" rather than "in distress." *Id.* at 51-53. She also noted that plaintiff appeared neat, clean, and rested. Dkt. 46-5, p. 163.

5

In general, France felt that Fontaine's self-reported symptoms conflicted with the symptoms observed by staff at Groveland. France Dep. 56-58. She thought that plaintiff's stated suicidal ideations could be symptoms of his antisocial personality disorder, rather than his depression. *Id.* at 58. Accordingly, she took no further steps to monitor plaintiff's psychological condition. *Id.* at 60. She did, however, schedule plaintiff to return to the clinic in four weeks, unless he requested to return sooner. Dkt. 46-5 p. 164.

### C. Defendant N.P. Cornwall

Early in 2013, Fontaine injured himself while exercising in the prison yard. Fontaine Dep. 54. On January 28, 2013, plaintiff went to sick call for treatment. Dkt. 46-4, p. 48. Groveland staff provided him with Motrin and scheduled a follow up in one week with a nurse practitioner. *Id.* On February 6, 2013, N.P. Cornwall prescribed plaintiff Robaxin, a muscle relaxer, to treat his injury. Fontaine Dep. 9 55-56; Dkt. 46-4 p. 47. Plaintiff self-carried the Robaxin. Fontaine Dep. 56-57.

Fontaine took Robaxin for approximately one full month without issue. Fontaine Dep. 57. On March 4, 2013, plaintiff returned to sick call to obtain a new prescription for Robaxin, and scheduled an appointment with N.P. Cornwall. Dkt. 46-4, p. 47. He saw plaintiff on March 29, 2013, and wrote him a prescription for sixty tablets of Baclofen, another muscle relaxer. Fontaine Dep. 58; Dkt. 46-4, p. 46. Plaintiff similarly self-carried the Baclofen. Fontaine Dep. 58.

Fontaine's medical chart, which N.P. Cornwall had access to, included a notification that OMH had labelled Fontaine a Level Two mental health risk. Dkt. 45-12 ("Cornwall Dep."), pp. 20-21. His practice was to review the OMH section of every patient's records before he saw them. *Id.* at 26-27. If he saw that a patient is a Level Two risk, he typically looks at the rest of their records to determine if there are any "red flags" that might require

additional investigation with OMH.[6] *Id.* at 21-22. This defendant did not, however, have access to plaintiff's mental health records. *Id.* at 23. He never reached out to OMH to resolve any concerns. *Id.* Plaintiff never told this defendant that he felt suicidal. Fontaine Dep. 59.

### D. **Fontaine's April 2013 Suicide Attempt**

Fontaine remembers nothing unusual about the night of April 12, 2013. Fontaine Dep. 60-61. He had no fights, confrontations, or personal disasters. *Id.* at 60. Plaintiff does not remember having told anyone that he was suicidal in the preceding forty-eight hours. *Id.* Plaintiff began his night by watching a film that DOCCS played for the inmates, and then returned to his cell. *Id.* He went into his dormitory, opened his locker, and saw the Baclofen. *Id.* at 65. Plaintiff removed the Baclofen from his locker and took every remaining pill. *Id.* at 61, 65.

On April 13, 2013, at 1:25 a.m., a DOCCS officer found Fontaine sitting on the edge of his bed vomiting into a plastic jug. Dkt. 46-5, p. 279. Plaintiff was incoherent, but still conscious. *Id.* The officer took plaintiff to the facility infirmary. *Id.* Staff documented that he had dilated pupils, uncontrolled vomiting, decreased body temperature, irregular breathing, no muscle tone, and no response to pain or communication. *Id.* Prison staff then transported plaintiff to Wyoming County Community Hospital. *Id.* Plaintiff spent five days in the hospital after his attempted suicide before returning to Groveland. Fontaine Dep. 66-67.

### E. **Procedural History of the Present Claim**

On April 11, 2015, Fontaine filed the instant complaint. Dkt. 1. On April 25, 2016, plaintiff filed an amended complaint, which has become the operative pleading. Dkt. 26. On June 21, 2017, plaintiff voluntarily dismissed his claims against defendant Dr. Ramineni.

---

[6] In his deposition, N.P. Cornwall provided some examples of red flags including whether the patient suffers from schizophrenia or takes several medications. Cornwall Dep. 21-22.

7

Dkt. 43. On July 28, 2017, defendants moved for summary judgment under Rule 56. Dkt. 45. The parties having fully briefed the motion, the Court now considers it on the parties' submissions without oral argument.

### III. LEGAL STANDARD

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Good*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

### IV. DISCUSSION

Defendants assert eight total defenses against Fontaine's claims. Against plaintiff's § 1983 claims, defendants argue that: (1) plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); (2) defendants are

entitled to qualified immunity; and (3) plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Against Fontaine's New York law claims, defendants raise the following defenses: (1) plaintiff's claims of negligence actually sound in medical malpractice, which plaintiff has no expert support to prove; (2) plaintiff cannot adequately establish negligent infliction of emotional distress; (3) this Court should decline to exercise supplemental jurisdiction of these claims under 28 U.S.C. § 1367(c)(3) ("§ 1367"); and (4) this Court lacks subject-matter jurisdiction over the state law claims against N.P. Cornwall, because N.Y. CORR. LAW § 24 exclusively vests jurisdiction of state law claims against DOCCS employees in the New York Court of Claims.

Finally, defendants assert against all of Fontaine's claims the defense of Eleventh Amendment Immunity, to the extent that plaintiff asserts a claim against defendants in their official capacities.[7]

### A. Deliberate Indifference to Fontaine's Medical Needs

Fontaine alleges that defendants Dr. Nieves and France exhibited deliberate indifference to plaintiff's medical needs by failing to properly treat his suicidal ideations. Similarly, he alleges that defendant N.P. Cornwall exhibited deliberate indifference by allowing him to self-carry Baclofen despite his history of suicides and depression. Plaintiff bases all three claims on § 1983.

Section 1983 allows citizens to bring civil suits against actors under color of state law who infringe their constitutional rights. *See Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). The Eighth Amendment provides an express constitutional right to freedom from "cruel and

---

[7] Defendants correctly assert that the Eleventh Amendment bars suit against state officials in their official capacities. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). However, Fontaine's suit is entirely against defendants in their personal capacities, so the point is moot.

unusual punishments." U.S. CONST. amend. VIII. "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee" and renders it applicable to the states and state actors. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947)). Courts have extended the prohibition on cruel and unusual punishment to note that state officials must provide inmates with "adequate medical care." *Salahuddin*, 467 F.3d at 279.

To prove an Eighth Amendment violation for inadequate medical care, the plaintiff must prove: (1) "that she [or he] had a serious medical condition;" and (2) "that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (alteration in original) (internal citations and quotation marks omitted).

Regarding the serious medical condition prong, courts have found that "[t]reatment of mental disorders of mentally disturbed inmates is . . . a serious medical need . . . ." *Hamilton v. Smith*, 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009); *see Jean v. Barber*, 2011 WL 2975218, at *1, 5 (July 21, 2011) (affirming magistrate's determination that plaintiff who had attempted suicide had pled a serious medical need).

The second prong of the test requires plaintiff to prove the defendants acted with deliberate indifference to that established medical need. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The plaintiff must therefore establish that "[s]ubjectively, the official charged with deliberate indifference must act with a 'sufficiently culpable state of mind.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

In other words, the official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hill*, 657 F.3d at 122 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). As a result,

"[m]ere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (internal citations and quotation marks omitted). Similarly, disagreement about a caregiver's choice of treatment is not evidence of deliberate indifference. *Wright v. Rao*, 622 F App'x 46, 47 (2d Cir. 2015) (summary order).

There is little dispute that Fontaine has successfully pled a serious medical condition in the form of his mental wellbeing, which resulted in attempted suicide. *See Jean*, 2011 WL 2975218 at *1, 5. Instead, the parties' chief area of dispute is whether plaintiff has sufficiently established that defendants acted with deliberate indifference to that medical need.

### 1. Dr. Nieves.

First, it is true that Dr. Nieves was aware of Fontaine's 2002 suicide attempt at the time he treated him. Dkt. 45-13, ¶ 6. However, that attempt had occurred nearly eleven years prior to the events giving rise to this claim. The doctor examined plaintiff specifically to gauge his likelihood of suicidal tendencies, and found no evidence of "psychosis, suicidal or homicidal ideas, intent, or plan." Nieves Dep. 30-31; Dkt. 46-5, p. 80. Moreover, he did not ignore plaintiff's medical history, but instead treated plaintiff by prescribing him Celexa, an additional antidepressant. Dkt. 46-5, p. 81. Because he did, in fact, treat plaintiff, these arguments amount only to disagreement with his chosen care, and cannot rise to the level of deliberate indifference. *Wright*, 622 F. App'x at 47.

Fontaine's only further argument for Dr. Nieves' deliberate indifference is that he did not see plaintiff again within six to eight weeks of their January 22, 2013 examination, despite his awareness of plaintiff's mental health history and recent placement in 2:1 watch in Fishkill, and that plaintiff appeared to be depressed with a blunted affect during therapy. Dkt. 46-5,

11

p. 80-81. This argument is also unavailing. The doctor expressed a legitimate reason to delay seeing plaintiff again, namely, giving time for his adjustments to plaintiff's medications to take effect. Nieves Dep. 19-20. He in fact tried to see plaintiff again on April 22, 2013, while plaintiff was in the facility infirmary. Dkt. 46-5, pp. 82-83. He also renewed plaintiff's medications to prevent a lapse in treatment. *Id.* at 83.

This time lapse alone does not amount to a knowing disregard of a risk to Fontaine's medical needs, especially when in Dr. Nieves' opinion he presented a low risk of suicide. *Hill*, 657 F.3d at 122. Accordingly, plaintiff has not demonstrated that the doctor exhibited deliberate indifference to his mental health. *See, e.g.*, *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 413-14 (S.D.N.Y. 2005) (noting that even after two suicide attempts, counseling and medication from a psychiatrist constituted medical care that was "not, as a matter of law, so inadequate as to rise to the level of a constitutional deprivation").

### 2. **France.**

Fontaine also fails to establish that France exhibited deliberate indifference. Plaintiff needed to prove that she in fact drew the inference that he was subject to a substantial risk of harm by suicide, and he failed to do so. *Hill*, 657 F.3d at 122. On the contrary, after two examinations of plaintiff, with recurring examinations scheduled, she determined that plaintiff was largely seeking attention, and made the express inference that plaintiff presented no risk of suicidality and presented no evidence of an increase in that risk. Dkt. 46-5, p. 162-64. Moreover, the last time that she saw plaintiff before April 13, 2013, plaintiff expressly told her that he "wouldn't kill himself." *Id.* at 163.

To rebut this point, Fontaine relies on the fact that France noted in her deposition that attention seeking behavior and suicide are not mutually exclusive. France Dep. 50-51. Similarly, he argues that this defendant exhibited deliberate indifference because when

12

informed of plaintiff's "daily thoughts of suicide," she responded only that plaintiff "couldn't let [him]self think that way." Fontaine Dep. 51-52. These too, however, are insufficient to carry plaintiff's burden. The immediate documentary evidence shows that France thought that plaintiff showed no signs of suicidality at the time of their second meeting. Dkt. 46-5, p. 164. Plaintiff provides no evidence to dispute that his lack of any suicidal intent or plan beyond death wishes led her to the conclusion that he was not a suicide risk. *Id.*

Without establishing France's subjective awareness that plaintiff was an active suicide risk, his deliberate indifference claim against her must be dismissed. *See, e.g.*, *Robinson v. Taylor*, 2019 WL 1429529, at *7 (N.D.N.Y. Mar. 29, 2019) ("The fact that [p]laintiff attempted suicide after medical professionals had examined him and found him not to be a risk of harm to himself does not itself establish deliberate indifference.") (citing *Sonberg v. Niagara Cty. Jail*, 2012 WL 5617539, at *9 (W.D.N.Y. Nov. 15, 2012)); *Pooler v. Nassau Univ. Med. Ctr.*, 848 F. Supp. 2d 332, 349-50 (E.D.N.Y. 2012) (noting that therapist without ability to prescribe medication did not act with deliberate indifference for failing to take action where plaintiff informed therapist that he wanted to commit suicide but had no plans to do so).

### 3. N.P. Cornwall.

Lastly, Fontaine's claim against N.P. Cornwall for deliberate indifference also fails because plaintiff has not established his subjective awareness that plaintiff was at risk. Plaintiff asserts three facts which he claims establish this defendant's awareness that plaintiff posed a suicide risk. First, he claims that the OMH section of his medical records would establish that he was being treated for dysthymia with Remeron and Celexa. Second, plaintiff claims that his file included notation of his placement on suicide watch in 2012 and also claims—without evidence—that a "front sheet" attached to his records would reinforce the same. Third, plaintiff claims that his mental health screening form from December 3,

13

2012 would have alerted this defendant that on that date plaintiff had acknowledged that he had attempted suicide in 2002, and noted that he had been thinking about committing suicide on that date.[8]

Assuming for the purposes of summary judgment that N.P. Cornwall did, in fact, know all three facts that Fontaine asserts establish knowledge of plaintiff's suicide risk, those facts are insufficient to establish that he knew that plaintiff presented an imminent risk of suicide, especially during the relevant timeframe of the March 29, 2013 decision to allow plaintiff to self-carry Baclofen. Dkt. 46-4, p. 47. His mere knowledge that plaintiff took Celexa and Remeron to treat his depression is of no moment. Mere treatment for depression does not preclude a patient from self-carrying medication.

Moreover, Fontaine had carried and appropriately taken Robaxin for a full course of treatment between February 14 and March 29, 2013. *Id.* at 46-47. Additionally, plaintiff identified no triggering event that would have given anyone notice of his intention to commit suicide, nor did he notify anyone of that intent within forty-eight hours of his attempt. Fontaine Dep. 61. He also never told N.P. Cornwall that he wanted to take his own life. *Id.* at 59.

Put together, even assuming that N.P. Cornwall knew that Fontaine could pose a suicide risk, there is no evidence whatsoever that he drew the necessary inference that plaintiff posed such a substantial present danger of suicide that allowing him to self-carry Baclofen created an unreasonable risk that plaintiff would use it to overdose. *Hill*, 657 F.3d at 122.

Accordingly, Fontaine has failed to provide sufficient evidence that any defendant was deliberately indifferent to his mental well-being. It is possible plaintiff has successfully

---

[8] On an identical screening sheet dated December 31, 2012, Fontaine referenced his 2002 suicide attempt, but denied that he had "been thinking about suicide." Dkt. 46-4, p. 21.

14

established negligence for the purposes of summary judgment, but the Eighth Amendment requires a higher standard of proof. Plaintiff has not shown any defendant to have sufficient actual awareness of plaintiff's suicide risks to meet the standard of deliberate indifference. Accordingly, plaintiff's § 1983 claim must be dismissed. *See, e.g.*, *Robinson*, 2019 WL 1429529, at *7 (finding no deliberate indifference for failure to properly monitor inmate who attempted suicide because mere fact that defendants "might have ultimately been wrong in [their] professional judgment does not support a showing of deliberate indifference").[9]

### B. State Law Claims

The Court now turns to Fontaine's supplemental state law claims. Plaintiff asserts claims of negligence and negligent infliction of emotional distress against all defendants.

#### 1. N.P. Cornwall's Immunity Under N.Y. CORR. LAW § 24.

For the first time in their reply to Fontaine's opposition to summary judgment, defendants asserted as a defense that the state law claims against N.P. Cornwall are barred by N.Y. CORR. LAW § 24. As a general rule, "[t]his Circuit has made it clear it disfavors new issues being raised in reply papers." *S.M.R.C., Inc. v. Watkins*, 2015 WL 5774777, at *6 n.10 (E.D.N.Y. May 4, 2015) (alterations in original). However, "a court must satisfy itself that it has subject matter jurisdiction and may at any time in the course of litigation consider whether such jurisdiction exists[.]" *Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 435 F.3d 127, 133 (2d Cir. 2006).

"New York law prevents an inmate from suing, in either federal or state court, a correctional employee in her individual capacity[.]" *Gordon v. City of New York*, No. 05-0351-PR, slip op. 2005 WL 2899863, at *1 (2d Cir. Nov. 3, 2005) (citing *Baker v.*

---

[9] Because the Court finds that plaintiff has failed to establish a claim of deliberate indifference capable of surviving summary judgment, the Court need not address defendants' remaining defenses to the § 1983 claim.

*Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996)). Instead, plaintiffs can only bring these claims in New York's Court of Claims. N.Y. CORR. LAW § 24.2. Section 24 by extension serves to deprive federal courts of subject matter jurisdiction over all claims against correctional employees. *See Jackson v. Yando*, 2016 WL 6267967, at *2 (N.D.N.Y. Oct. 26, 2016) (dismissing state law claims against corrections officials for lack of subject matter jurisdiction). However, § 24 does not apply to independent contractors working on DOCCS' behalf. *Rothschild v. Braselmann*, 69 N.Y.S.3d 375, 378 (App. Div. 3d Dep't 2018) (noting that plaintiff could still sue doctors providing contractual services to prisoner plaintiff in general state court).

Defendants' argument that this Court lacks subject-matter jurisdiction over plaintiff's state law claims against N.P. Cornwall in light of § 24 has merit. It also would have had merit at any other point in the course of this action. Defendants' failure to raise this defense earlier wasted Fontaine's—and this Court's—time and resources in the litigation of a claim over which this Court has no authority to proclaim judgment. Nevertheless, plaintiff's state law claims against this defendant must be dismissed. Section 24 does not apply, however, to plaintiff's claims against France and Dr. Nieves, who work for OMH, rather than DOCCS. Dkt. 45-9, ¶ 2 (declaring that France is employed by OMH and not DOCCS); Dkt. 45-13, ¶ 2 (declaring that Dr. Nieves is also an OMH employee).

### 2. Supplemental Jurisdiction over Dr. Nieves and France.

This Court still maintains supplemental jurisdiction of Fontaine's claims against Dr. Nieves and France under 28 U.S.C. § 1367(a). *See Briarpatch, Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) ("[F]ederal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to form part of the same case or controversy under Article III of the United States Constitution.") (internal quotation marks omitted).

This Court may, however, "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . —judicial economy, convenience, fairness and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Especially because Fontaine cannot attain relief from N.P. Cornwall in this Court, the balance of factors favors declining supplemental jurisdiction. It would be unfair to continue the claim against Dr. Nieves and France but to allow N.P. Cornwall to sit to the side. In the New York Court of Claims, plaintiff could proceed against all three defendants simultaneously, rendering that the better forum for plaintiff's state law claims. Accordingly, plaintiff's remaining state law claims are dismissed without prejudice.[10]

## V. CONCLUSION

Fontaine attempted suicide under DOCCS' watch. This is a serious matter, and merits concern and scrutiny. However, this Court can only hold defendants liable for their own wrongdoings, and only to the extent their acts were wrong. Plaintiff has not met the high burden of proving that defendants were deliberately indifferent to his mental health. Therefore, his claims in federal court must fail. But that does not end his path to what remedy, if any, he merits. Plaintiff may bring his state law claims before the New York Court of Claims, so long as he does so within the next six months, and try his hand again before that court. N.Y. C.P.L.R. § 205(a) (noting that if plaintiff's timely action is "terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final

---

[10] Because this Court lacks or declines jurisdiction over Fontaine's state law claims, it need not reach defendants' other asserted defenses.

judgment upon the merits, the plaintiff . . . may commence a new action upon the same transaction . . . within six months after the termination"). This Court, however, dismisses his complaint in its entirety.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. Plaintiff's claims for deliberate indifference under § 1983 are DISMISSED WITH PREJUDICE; and

3. Plaintiff's claims for relief under state law are DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated: September 9, 2019
Utica, New York.